This memorandum is a duplicate of D39 with the exception of a "Redacted Version" stamp added to the upper-right hand corner of the first page

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(BID PROTEST)

Redacted Version

[redacted]

| | | |
|---|---|---|
| GEMINI TECH SERVICES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 25-484C |
| | ) | Judge Armando O. Bonilla |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| RED RIVER SCIENCE AND | ) | |
| TECHNOLOGY, LLC | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

RED RIVER SCIENCE AND TECHNOLOGY, LLC'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND CROSS-MOTION FOR JUDGMENT TO AFFIRM THE AGENCY'S ACTION BASED ON THE ADMINISTRATIVE RECORD

Eric Whytsell
STINSON LLP
1144 15th St., Suite 2400
Denver, CO 80202
Email: eric.whytsell@stinson.com
Tel.: 303.500.7193

Counsel of Record for
Red River Science and Technology, LLC

Of Counsel:
Susan Warshaw Ebner
Alexandra Stanley
Simone Stover
STINSON LLP

Dated: May 21, 2025

[redacted]

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ..... i

I. PRELIMINARY STATEMENT ..... 1

II. QUESTIONS PRESENTED ..... 2

III. BACKGROUND ..... 2

A. The RFP states that the purpose of the Agency's Strict Compliance Review was to assess offerors' compliance with RFP proposal instructions and that the Agency reserved the right to waive strict compliance in the best interests of the government. ..... 2

B. Modification 0005 to the RFP makes clear that the Army would not accept a proposal that voluntarily capped or offered discounted indirect rates and allowed offerors the opportunity to revise their proposals in response. ..... 3

C. In their proposals, Gemini and RRST took diametrically opposed approaches to proposing overhead and G&A rates ..... 4

1. Notwithstanding its past rate history and its own projections of increased costs going forward, Gemini committed to abide by a [redacted] overhead rate and a [redacted] G&A rate. ..... 4

2. In contrast, RRST based its proposal on its actual labor and direct costs burdened with the full amount of the only two types of indirect costs it uses -- G&A and fringe ..... 7

D. The RFP states that the Agency may waive the Strict Compliance Review after an analysis and determination that doing so is in the Government's best interest. ..... 10

IV. ARGUMENT ..... 11

A. Standard of Review ..... 11

B. The Army Properly Evaluated the Proposals of Gemini, Protester, and the Other Offerors in an Impartial, Fair, and Equitable Manner. ..... 13

1. The Army properly removed Gemini from further consideration for award after reasonably determining that Gemini ignored the plain language of the RFP and capped its proposed Overhead and G&A rates. ..... 13



[redacted]

a. The Solicitation clearly prohibits offerors from capping or discounting their rates. ... 13

b. Gemini did not protest this modification of the solicitation's evaluation criteria for consideration for award. ... 13

c. Despite the express terms of the procurement and the opportunity to revise its proposal, Gemini clearly capped its overhead and G&A rates. ... 14

d. In contrast, RRST's proposal affirmatively states that it includes all costs on all hours--and its chosen cost categories do not change that. ... 18

2. The Army properly exercised its discretion to waive the Strict Compliance Review upon its reasonable determination that doing so was in the Government's best interests. ... 21

C. Plaintiff has not established that it was prejudiced by the Agency actions here. ... 25

D. Plaintiff has not established grounds for declaratory or injunctive relief. ... 25

V. CONCLUSION ... 27

CERTIFICATE OF SERVICE ... 29



[redacted]

# TABLE OF AUTHORITIES

Page(s)

Cases

A&D Fire Prot., Inc. v. United States,
72 Fed. Cl. 126 (2006) ..........12

Advanced Data Concepts, Inc. v. United States,
216 F.3d 1054 1058 (Fed. Cir. 2000)..........12

Alfa Laval Separation, Inc. v. United States,
175 F.3d 1365 (Fed. Cir. 1999)..........13

Bannum, Inc. v. United States,
404 F.3d 1346 (Fed. Cir. 2005)..........12

Blue & Gold Fleet, L.P. v. United States,
492 F.3d 1308 (Fed. Cir. 2007)..........14

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971)..........12

COMINT Sys. Corp. v. United States,
700 F.3d 1377 (Fed. Cir. 2012)..........14

E.W. Bliss Co. v. United States,
77 F.3d 445 (Fed. Cir. 1996)..........25

Govwave. LLC, et al. v. United States,
175 Fed. Cl. 564 (2025) ..........17, 25

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001)..........12

Latecoere Int'l, Inc. v. U.S. Dep't of the Navy,
19 F.3d 1342 (11th Cir. 1994) ..........12

MVL USA, Inc. v. United States,
174 Fed. Cl. 437 (2025) ..........12

Nat'l Gov't Servs., Inc. v. United States,
923 F.3d 977 (Fed. Cir. 2019)..........12

Oak Grove Techs., LLC v. United States,
116 F.4th 1364 (Fed. Cir. 2024) ..........25



[redacted]

PGBA, LLC v. U.S.,
389 F.3d 1219 (Fed. Cir. 2004)....26, 27

Sikorsky Aircraft Corp. v. United States,
773 F.3d 1315 (Fed. Cir. 2014)....21

Statistica, Inc. v. Christopher,
102 F.3d 1577 (Fed.Cir.1996)....13

Sys. Stud. & Simulation, Inc. v. United States,
146 Fed. Cl. 186 (2019)....12

Sys. Stud. & Simulation, Inc. v. United States,
No. 18-1494C, 2019 WL 912277 (Fed. Cl. Jan. 22, 2019)....13

Statutes

5 U.S.C. § 706(2)....12

28 U.S.C. § 1491(b)(4)....12

Administrative Procedure Act Section 706....12

Tucker Act, 28 U.S.C. § 1491(b)(1)....12

Other Authorities

48 C.F.R. § 1.602–2(b)....25

48 C.F.R. § 14.405....25

Ct. Order 2, n. 2, ECF No. 17....1



[redacted]

## I. PRELIMINARY STATEMENT

In its Memorandum in Support of Its Motion for Judgment on the Administrative Record ("MJAR"), Plaintiff identifies a number of concerns with the Agency evaluation that it contends are central to this case. Specifically, Plaintiff contends that the Agency erred by, inter alia: (i) unequally evaluating Plaintiff Gemini Tech Services, LLC ("Plaintiff," "Protester," or "Gemini") and Defendant-Intervenor Red River Science and Technology, LLC ("Intervenor" or "RRST") by failing to exclude Intervenor from further consideration for award for capping its overhead rate when it excluded Plaintiff for the same reason; and (ii), unfairly ignoring the noncompliances in every other offeror's proposal. Both of these arguments directly relate to RRST. Pursuant to the Court's March 26, 2025 Order,[1] Intervenor limits its Memorandum in Support of Its Opposition to Plaintiff's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record to responses to those issues raised by Protester in its MJAR that are directly related to Intervenor.

As demonstrated below, Plaintiff has failed to meet its burden of establishing that the Agency actions identified here and in the decision to award to RRST were arbitrary or capricious, or that such grounds warrant the Court's issuance of a permanent injunction in this matter. Instead,

[1] The Order restricts Intervenor's Response here to only those issues that directly relate to Intervenor. Ct. Order 2, n. 2, ECF No. 17 ("Defendant-intervenor's briefs shall be limited to those issues directly related to RRS&T. Having neither prepared nor evaluated plaintiff's proposal, defendant-intervenor is not in a position to assist the Court on those issues."). Following that Order, Protester filed an Amended Complaint and its Motion for Judgment on the Administrative Record and Memorandum in Support thereof, raising the two new protest grounds. In the event the Court would seek Intervenor's input on other issues raised in this protest, Intervenor stands ready to respond. Intervenor also reserves the right to request an opportunity to respond in the event additional arguments impacting Intervenor are raised in any supplemental response by Protester.



[redacted]

as demonstrated by the record and this memorandum, such Agency actions were reasonable and appropriate and support its decision and award of the contract to RRST.

For these reasons, the Court should deny Plaintiff's Motion for Judgment on the Administrative Record and grant Defendant-Intervenor's Cross-Motion for Judgment on the Administrative Record.

## II. QUESTIONS PRESENTED

1. Whether the Agency properly removed Gemini from further consideration for award after reasonably determining that Gemini ignored the plain language of the Request for Proposal ("RFP") by capping its proposed Overhead and G&A rates.
2. Whether the Agency properly exercised its discretion to waive the Strict Compliance Review for offerors other than Gemini upon its reasonable determination that doing so was in the Government's best interests.

## III. BACKGROUND

Intervenor generally agrees with the statement of facts laid out in pages 2-8 of the Protester's Memorandum in Support of its MJAR as it relates to the identified issues being addressed by Intervenor except as noted below and provides the following supplemental facts relating to those relevant topics.

### A. The RFP states that the purpose of the Agency's Strict Compliance Review was to assess offerors' compliance with RFP proposal instructions and that the Agency reserved the right to waive strict compliance in the best interests of the government.

Section A.18 of the RFP informs offerors:

> The Government will compare the Offeror's proposal to Section L in order to perform a compliance review. Failure to provide proposals in accordance with the instructions/format specified in this RFP shall render the Offerors proposal non-compliant. The proposal will not be evaluated and will not be further considered for award. The Government reserves the right to waive the Strict Compliance Review if it is in the Government's best interest.



[redacted]

AR Tab 28 at AR 678 (emphasis added); accord AR 737, RFP at M.3.2 ("Proposals will be reviewed to determine if all compliance requirements set forth in Section L are satisfied."). Section M of the RFP reiterates the Agency's right to waive the Strict Compliance Review and allow such proposals to continue to compete and be considered for award if doing so is in the government's best interests. See AR 737, RFP at M.2 ("The Government reserves the right to: waive the strict compliance review, limit the competitive range for the purposes of efficiency; conduct discussions at any stage of the evaluation process; and make no award should no offer prove to be acceptable based on the criteria set forth in this RFP."); id., RFP at M.3 ("The Government reserves the right to waive the Strict Compliance Review if it is in the Government [sic] best interest").

The Protester did not challenge the Agency's right to waive the Strict Compliance Review prior to submitting its proposal in this procurement.

B. Modification 0005 to the RFP makes clear that the Army would not accept a proposal that voluntarily capped or offered discounted indirect rates and allowed offerors the opportunity to revise their proposals in response.

RFP Modification 0005 modified the RFP to flatly prohibit discounting and capping of indirect rates and to reiterate the consequences of violating the prohibition:

> …Update Section L, Paragraph L.5.4.2.13(b)(5)
>
> FROM: L.5.4.2.13(b)(5) Capping or Discounted Indirect Rates. Offerors, or its subcontractors shall not be permitted to voluntarily cap or offer discounted indirect rates that are not supported by the data required by paragraphs L.5.4.2.13(a)(1) through L.5.4.2.13(b)(4). Offerors proposing capped or discounted indirect rates will not be further considered for award.
>
> TO: L.5.4.2.13(b)(5) Capping or Discounted Indirect Rates. Offerors, or its subcontractors shall not be permitted to voluntarily cap or offer discounted indirect rates. Offerors proposing capped or discounted indirect rates will not be further considered for award.

AR 667, RFP, Amendment 0005 (emphasis added). By removing the original reference to rates "not supported by the data required by paragraphs L.5.4.2.13(a)(1) through L.5.4.2.13(b)(4)." id.,



[redacted]

the modification eliminated any potential ambiguity and clarified the bright-line prohibition. The change was intended to make clear to all Offerors that the Agency would "exclude any Offeror from further consideration for award if it chooses to self-cap rates. AR 4139 - 40 (Tab 42, October 3, 2024 Email from C. Holiday re SSS: Status of EAGLE RFPs) (emphasis added). This Amendment to the RFP also "afford[ed] the opportunity for all interested party offerors … to revise its [sic] proposal to ensure capped rates are removed." Id.; see AR Tab 26, AR 666, Modification 0005 ("Offerors are afforded the opportunity to revise proposals.").

Plaintiff did not protest or revise its proposal in response to this announced change to the RFP to prohibit use of voluntarily capped or discounted indirect rates. See Plaintiff's MJAR at p. 10 and its comparison of AR 1447 with AR 4850).

C. In their proposals, Gemini and RRST took diametrically opposed approaches to proposing overhead and G&A rates.

1. Notwithstanding its past rate history and its own projections of increased costs going forward, Gemini committed to abide by a [redacted] overhead rate and a [redacted] G&A rate.

In its proposal, Gemini explains that its proposed [redacted] overhead rate

[redacted]

AR 4850, AR Tab 43d, Section 1.2 (emphasis added).

In support, Gemini's proposal provides its historical and budgeted overhead rates for 2021 through 2029. See AR Tab 43d, 2024-10-30 – Gemini (Excel Spreadsheet). Gemini's historical experience reveals an increase in the overhead pool from [redacted] between 2021 and 2023. See AR Tab 43d, 2024-10-30 – Gemini (Excel Spreadsheet), Tab "Historical



[redacted]

Overhead 2021-2023." During that period, its overhead rate fluctuated from [redacted] and back again. Id. Gemini projects the total budgeted overhead pool will fall to [redacted] and then steadily rise to [redacted] between 2024 to 2029 but has budgeted the overhead rate as [redacted] for all those years. Id., Tab "Budgeted Overhead 2024-2029." Gemini's historical and projected overhead figures are collected in Figure 1 below.

[redacted]

Figure 1[2]

Similarly, Gemini claims that its proposed [redacted] G&A rate is supported by the pool costs listed within the Budgeted G&A tab of the IERD Excel file. Pool costs relate to G&A labor, travel, automobile related expenses, corporate insurance policies, professional fees, taxes and license costs, as well as utility and communication expenses. GTS has included historical pool cost details for 2021, 2022 and 2023 within the IERD Excel file in support of the historical G&A rates. Id., Section 1.3. Gemini's historical experience reveals an increase in its G&A pool from [redacted] to [redacted] between 2021 and 2023. See AR Tab 43d, 2024-10-30 – Gemini (Excel Spreadsheet), Tab "Historical G&A 2021-2023." During the same period, its G&A rate grew from

[2] See AR Tab 43d, 2024-10-30 – Gemini (Excel Spreadsheet), Tab "Historical Overhead 2021-2023."; Id., Tab "Budgeted Overhead 2024-2029."



[redacted]

[redacted]. Id. Gemini projects its total overhead pool will fall to [redacted] in 2024 then steadily increase to [redacted] between 2024 and 2029 but has budgeted its G&A rate as [redacted] for all those years. Id., Tab "Budgeted G&A 2024-2029." Gemini's historical and projected G&A figures are set forth in Figure 2 below.

[redacted]

Figure 2[3]

Gemini acknowledges its proposed overhead and G&A rates are lower than their actual 2023 rates but attempts to explain away the significantly lower budgeted rates by referencing newly implemented [redacted] it claims will result in efficiencies and by stating it will abide by the proposed rates:

> GTS acknowledges that the 2023 historical rate is higher than the [redacted] budgeted rate. However, GTS has implemented automated systems and adjusted corporate staffing during 2024 that yields greater efficiencies and reduces <u>the burden of overhead labor required to</u> support our projects. We are committed to the [redacted] Overhead rate applied within this offer and will abide by said rate should an award be made to GTS in support of this effort.

AR 4850, AR Tab 43d, Section 1.2 Overhead (emphasis added); accord, Section 1.3 G&A (nearly identical language relating to [redacted] G&S rate).

[3] See AR Tab 43d, 2024-10-30 – Gemini (Excel Spreadsheet), Tab "Historical G&A 2021-2023."; Id., Tab "Budgeted G&A 2024-2029."

2. In contrast, RRST based its proposal on its actual labor and direct costs burdened with the full amount of the [redacted].

In its final proposal, RRST expressly states that its

[redacted]

AR 5375, AR Tab 44d (emphasis added). The RRST proposal also explains its presentation and use of historical data:

[redacted]

AR 5392, AR Tab 44d.

RRST goes on to explain that its [redacted] AR 5393. This is borne out by RRST's historical G&A rate experience from 2020 to 2024 and its budgeted G&A rates for the contract term. Between 2020 and 2022, RRST's total G&A costs rose [redacted]. See AR Tab 44d 2024-10-30 – RRST (Excel Spreadsheet) Tab "Indirect Rate Support."



[redacted]

RRST budgeted for a [redacted] between 2025 and 2029. Id. RRST's historical and projected G&A figures are set forth in Figure 3 below.

[redacted]

Figure 3[4]

RRST addressed the potential for variances in rates in the out years without promising to cap or discount its G&A rate no matter what G&A rates it experiences. Instead, its proposal explains why RRST believes its methodology and projections are sound. See generally, AR 5392-94. For example, RRST acknowledges and addresses the potential impact of differences between projected and actual sales volume:

[redacted]

[4] See AR Tab 44d 2024-10-30 – RRST (Excel Spreadsheet) Tab "Indirect Rate Support."



[redacted]

[redacted]

AR 5393-94 (emphasis added).

The RFP requires offerors to detail their pool and base costs for all proposed indirect expense rates, but it does not require offerors to include any specific types of indirect costs in their proposals:

> Indirect rates allocate indirect costs such as overhead, general & administrative (G&A) expense, and fringe benefit costs. The Offeror shall provide the pool and base costs or FPRAs for all proposed indirect expense rates ….

AR 729, Section L.5.4.2.13(a) (emphasis added). RRST proposed its indirect expense rates and provided pool and base costs for all proposed indirect expense rates as required, including in its proposal detailed data concerning the two types of indirect costs it uses: G&A and Fringe. See AR Tab 44d 2024-10-30 – RRST (Excel Spreadsheet) Tab "Indirect Rate Support." RRST's proposal makes clear that it does not designate any of its indirect costs as "overhead," on this or any proposals (or contract). Instead, RRST generally organizes its costs into [redacted]. Id. There is no [redacted] category in either RRST's historical costs or those it projected for the future. Id. Instead, many of the costs the Gemini characterizes as overhead in its accounting system RRST treats as [redacted]. Indeed, a comparison of RRST's proposed [redacted] categories to Gemini's proposed [redacted] cost categories reveals that the types of costs that Gemini accounts for in its [redacted] pool are the same or similar types of costs RRST accounts for in its [redacted] pools because of the way it accounts for its costs, as demonstrated in Figure 4.



[redacted]

| Gemini Overhead Costs | RRST [redacted] |
|---|---|
| Overhead labor salaries, overhead labor, airfare tickets, travel agent fees. Lodging, rental car and gas, per diem, tax and tolls, parking, mileage, business meals, conferences and seminars, background and drug screens, computer charges.etc. | Airfare, auto, hotel, parking, per diem, meals, mileage, local, fuel, hardware, supplies, background and drug screens, uniforms, laundry, pastage & delivery, print & reproductions, office expense, conference / seminar, telephone, repairs, Vehicle lease, cleaning, etc. |

Figure 4[5]

RRST has not discounted its indirect [redacted] expense rates, rather it has accounted for its costs in different cost pools as appropriate to the way it does business, resulting in it having only [redacted].[6]

D. The RFP states that the Agency may waive the Strict Compliance Review after an analysis and determination that doing so is in the Government's best interest.

The RFP states:

> The Government will compare the Offeror's proposal to Section L in order to perform a compliance review. Failure to provide proposals in accordance with the instructions/format specified in this RFP shall render the Offerors proposal non-compliant. The proposal will not be evaluated and will not be further considered for award. The Government reserves the right to waive the Strict Compliance Review if it is in the Government's best interest.

AR 678, Conformed RFP, Section A.18 (emphasis added).[7]

[5] See, e.g., AR Tab 43d, 2024-10-30 – Gemini (Excel Spreadsheet), Tab "Historical G&A 2021-2023" (Gemini); AR Tab 44d 2024-10-30 – RRST (Excel Spreadsheet) Tab "Indirect Rate Support" (RRST).

[6] See Note 5, supra.

[7] Accord AR 737, Conformed RFP, Section M.3 ("The Government reserves the right to waive the Strict Compliance Review if it is in the Governments best interest."); Id., at Section M.3.2.1 ("The Government will compare the Offeror's proposal to Section L to perform a compliance review. Any Offeror's proposal determined non-compliant per the terms noted in Section L or determined non-compliant per paragraph M.3.2.1.1 below, will not be evaluated and will not be further considered for award.")



[redacted]

Here, as clearly contemplated by the RFP, the Agency did "compare [each] Offeror's proposal to Section L in order to perform a compliance review," id., and then determined that waiving strict compliance was "in the Government's best interest," id., because it properly maximized competition and helped the Army obtain best value:

> Due to only two proposals being found compliant, Per Section M.2, the PCO made the determination to waive strict compliance to maximize competition. Excluding these 8(a) Small Business offerors from further evaluations due to non-compliance would significantly reduce competition and is not in the USG's best interest. Moreover, having only two offerors proceed to technical evaluations is not advantageous to the USG. If one or even both offerors are deemed technically unacceptable, then the USG would expend valuable time and resources evaluating the additional offerors.

AR 8754, Source Selection Decision Document (emphasis added); see also, AR 4094, Strict Compliance Waiver, ¶ 2 (nearly identical language) and ¶ 3 ("Per Section M.2 of the FKKY RFP W52P1J-23-R-0088, the Government is waiving the Strict Compliance requirement of the evaluation criteria to allow greater competition and ultimately maximize the Government's ability to obtain the best value.") (emphasis added).

## IV. ARGUMENT

### A. Standard of Review

This protest was filed under the Tucker Act, 28 U.S.C. § 1491(b)(1). The Court's standard of review for evaluating bid protests is whether the alleged government action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Nat'l Gov't Servs., Inc. v. United States, 923 F.3d 977, 981 (Fed. Cir. 2019) (citing 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2))); see also MVL USA, Inc. v. United States, 174 Fed. Cl. 437, 458 (2025) (citing 28 U.S.C. § 1491(b)(4)) ("The Court evaluates bid protests under the framework laid out in Section 706 of the Administrative Procedure Act.").



[redacted]

To prevail, the protester bears the heavy burden of establishing that "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)); see also MVL USA, Inc., 174 Fed. Cl. at 459; A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005) ("[T]he court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."); Sys. Stud. & Simulation, Inc. v. United States, 146 Fed. Cl. 186, 199 (2019) (Procurement officials are "entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa, 238 F.3d at 1332-33 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994) (cleaned up)). Thus, the court's review of a procuring agency's decision is "highly deferential." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054 1058 (Fed. Cir. 2000) Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).

Where a violation of regulation or procedure is alleged, the protester must show that the alleged violation was "clear and prejudicial." Impresa, 238 F.3d at 1333 (citation and internal quotation marks omitted). This means that, even if a violation is shown, the protester still must demonstrate prejudice, that "there was a substantial chance it would have received the contract award but for" the violation. Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed.Cir.1996)); see also Sys. Stud. & Simulation, Inc. v. United States, No. 18-1494C, 2019 WL 912277, at *6 (Fed. Cl. Jan. 22, 2019), reissued for publication (Fed. Cl. Feb. 25, 2019) (citing Statistica Inc. and stating that the protesting party had to "show that there was a substantial chance that it would have been awarded the Task Order" at issue in the case).



[redacted]

Plaintiff has failed to meet its burden of establishing that the Agency actions addressed here and the decision to award to RRST were arbitrary or capricious. In contrast, as demonstrated below, such Agency actions were entirely reasonable and supported by the administrative record.

B. The Army Properly Evaluated the Proposals of Gemini, Protester, and the Other Offerors in an Impartial, Fair, and Equitable Manner.

1. The Army properly removed Gemini from further consideration for award after reasonably determining that Gemini ignored the plain language of the RFP and capped its proposed Overhead and G&A rates.

a. The Solicitation clearly prohibits offerors from capping or discounting their rates.

As noted above, Modification 0005 modified the RFP to flatly prohibit discounting and capping of indirect rates and to reiterate the consequences of violating the prohibition:

> L.5.4.2.13(b)(5) Capping or Discounted Indirect Rates. Offerors, or its subcontractors shall not be permitted to voluntarily cap or offer discounted indirect rates. Offerors proposing capped or discounted indirect rates will not be further considered for award.

AR 667, RFP, Amendment 0005 (emphasis added).[8] This amendment was intended to "exclude any Offeror from further consideration for award if it chooses to self-cap rates … [and] … "also afford the opportunity for all interested party offerors … to revise its [sic] proposal to ensure capped rates are removed." AR 4139 - 40 (Tab 42, Email from C. Holiday re SSS: Status of EAGLE RFPs, dated October 3, 2024 12:53:45 PM).

b. Gemini did not protest this modification of the solicitation's evaluation criteria for consideration for award.

[8] This prohibition reflects the Army's recognition that "the capping of indirect rates such as Fringe and G&A has significantly put Small Businesses at risk of performing services by not allowing them to adjust rates based upon the economy," AR Tab 34 MFR Direction to Remove Capped Rates from Task Orders, and its attempt to ensure the growth of small business participation in the Enhanced Army Global Logistics Enterprise ("EAGLE") program. See id. The decision not to allow capped rates was a rational decision well within the Army's discretion and applied to all Army EAGLE procurements, not just this one.



[redacted]

A challenge to the terms of the solicitation must be raised prior to the time for submission of proposals. Accordingly, Gemini had to raise any challenge to Modification 0005 prior to the time for submission of revised proposals to timely challenge this modification of the solicitation. See COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381-82 (Fed. Cir. 2012) (finding "Comint failed to preserve its challenge to Amendment 5 by not raising the issue before the award of the contract") (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1315 (Fed. Cir. 2007). Gemini failed to challenge the Agency's reservation of rights in any way. As a result, this protest--following award to Red River-is untimely. See COMINT, 700 F.3d at 1381-82. Thus, Plaintiff was required to submit a proposal that complied with the revised RFP terms and it could not "voluntarily cap or offer discounted indirect rates" in its proposal. Where, as here, it did so, the Agency had a rational and reasonable basis to remove it from further consideration for award.

c. Despite the express terms of the procurement and the opportunity to revise its proposal, Gemini clearly capped its overhead and G&A rates.

While RFP Modification 0005 flatly prohibited the capping or discounting of indirect cost rates and afforded offerors the opportunity to revise their proposals to respond to the prohibition, Gemini ignored the prohibition and made no changes to bring its proposal into compliance. Instead, it doubled down on its initial promise to abide by fixed overhead and G&A rates that are [redacted] or more lower than those it actually experienced from 2020 through 2023. More particularly, Gemini's proposed [redacted] overhead rate is less than a third of its actual overhead rate between 2020-2023, which was between [redacted] and [redacted]. See Figure 1, supra. Similarly, the proposed [redacted] G&A rate is less than half of Gemini's actual G&A rate for 2020-2023, which ranged between [redacted] and [redacted]. See Figure 2, supra; see generally Section III.C.1, supra.



[redacted]

Gemini claims it did not intend to cap or discount its indirect rates and explains that it did not change its discussion of indirect rates because it

> believed its proposal reflected a sound management strategy that aligned its operational performance with its budgeted projections. That is, Gemini committed to keeping its indirect rates low through internal efficiencies—not through an artificial reduction of what it would charge the Army.

Plaintiff's Memorandum in Support of its MJAR, at 6. Regardless of its intent, however, the only reasonable way to understand its proposal language is that Gemini was promising to apply its proposed lower overhead and G&A rates regardless of the overhead and G&A costs it actually experienced during the performance of the contract.

The proposal language in question attempts to explain the difference between Gemini's historical rate experience and the rates it proposed for this contract by touting its new "automated systems" and expected "greater efficiencies":

> GTS acknowledges that the 2023 historical rate is higher than the [redacted] budgeted rate. However, GTS has implemented automated systems and adjusted corporate staffing during 2024 that yields greater efficiencies and reduces the burden of overhead labor required to support our projects.

AR 4850, AR Tab 43d, Section 1.2 Overhead. Gemini offered the same explanation for its cap of the G&A it proposed. Id., Section 1.3 G&A (using nearly identical language to the Overhead cap to assert and explain its [redacted] G&A rate cap). Gemini sought to justify the drastic cuts it proposed based on a new "management strategy" and automation it was still in the process of rolling out in 2024 before it had actually seen its impact on costs. Gemini's claim that cost efficiency savings support cutting Gemini's historical overhead and G&A rates by [redacted] to the proposed fixed rates is based on its estimates and not its actual experience. See, e.g., AR Tab 43d, which shows that Gemini's 2024 figures are estimated, not actuals.



[redacted]

In an apparent attempt to address the possibility that the hoped-for efficiencies would not materialize, Gemini's proposal includes language to reassure the Agency that Gemini is "committed to" the proposed overhead ([redacted]) and G&A ([redacted]) rates and "will abide by said rate[s] should an award be made to GTS in support of this effort." Id., Section 1.2 Overhead (emphasis added); id., Section 1.3 G&A (nearly identical language). Gemini's word choice here is important. In common English usage, "to abide" by something means to conform to it or accept it without objection.[9] Here, Gemini's statement that it will "abide by" its proposed rates can only reasonably be understood to mean that it will not seek to adjust them based on the actual overhead and G&A costs it incurs going forward. In other words, it is capping its indirect expense rates.

Gemini claims that if the Agency viewed its "abide by" language as possibly capping its indirect rates, it should have sought clarification of Gemini and not removed it from the competition. Gemini MJAR at 16-18. However, there is no ambiguity to resolve, particularly given the proposal's express "commitment" (or promise) to abide by the rates. If Gemini really meant to convey that it believed that its rates were reasonable and well-founded, it could have said so. There was no need to make a promise to stick with the proposed rates without objection except to attempt to allay potential fears about their accuracy going forward.[10]

---

[9] See Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/abide (discussing phrase "abide by") (last visited May 18, 2025).

[10] Protester claims that its statement that it would "abide by" the indirect rates it quoted notwithstanding its historicals was not intended to be a cap or discount and that the Agency should have sought clarification of this ambiguity. Gemini Compliant at Count 2. However, the burden is on Protester as an offeror to comply with the requirements of the solicitation and to submit compliant proposals. Govwave. LLC, et al. v. United States, 175 Fed. Cl. 564, 636 (2025) (where solicitation's requirements are not ambiguous, they should be given their plain and ordinary meaning; offerors bear the burden of complying with those stated requirements). The Court will not assess the agency determination de novo, but rather under the arbitrary-capricious standard "must 'sustain an agency action evincing rational reason and consideration of relevant factors.' Govwave, LLC, 175 Fed. Cl at 613-14 (citation omitted). Given the clear exhortation that the



[redacted]

This is exactly how the Agency evaluators reasonably interpreted Gemini's commitment to abide by its proposed rates. Indeed, the cost analyst noted as much in her initial Cost Realism Analysis. Referencing the "abide by" statements in Gemini's proposal relating to the overhead and G&A rates, she observed:

> This sentence could be interpreted as capping the [redacted] Overhead rate should the award be made to GTS. To abide by the said rate of [redacted] should the award be made to GTS indicates that if the audited Overhead rate is higher than [redacted] for 2024 - 2029, GTS would use the [redacted] OH rate as proposed, which is capping their indirect rate.
>
> …
>
> This sentence could be interpreted as capping the [redacted] G&A rate should the award be made to GTS. To abide by the said rate of [redacted] should the award be made to GTS indicates that if the audited G&A rate is higher than [redacted] for 2024 - 2029, GTS would use the [redacted] G&A rate as proposed, which is capping their indirect rate.

AR 8953 and 8967, AR Tab 70, December 23, 2024 Cost Realism Analysis (emphasis in original).

Several weeks later,[11] the same analyst concluded that her initial reading of the language was correct and found the statements in question to manifest Gemini's intent to cap its overhead and G&A rates. See AR 8924 and 8938, AR Tab 69, January 13, 2025 Cost Realism Analysis. Ultimately, the Source Selection Authority ("SSA") agreed. He made his own assessment after reviewing the RFP, Gemini's proposal, and the analysis of the price analyst, and discussing the matter with the Source Selection Evaluation Board. See AR 8748, AR Tab 62, SSEB Chairperson Report. The SSA reasonably (i) determined that Gemini's proposal was capping/discounting its

---

requirement had changed and that the penalty for noncompliance would be loss of the opportunity to compete and be considered for award, Protester failed to address and ensure its proposal was clear at its own peril. The Agency determination that Protester did not comply with the solicitation requirement was reasoned and reasonable, and the Court must defer to this decision under established case law. Id.

[11] Gemini's attempt to characterize the Agency's thinking on this issue as "unexplained" is unavailing. See Plaintiff's Memorandum in Support of its MJAR, at 7-8, 15-16. The progression from the analyst's first identifying the most likely meaning to deciding on that meaning to then having it confirmed by the SSA after his discussion with the SSEB is not only well explained, it is also entirely reasonable and well considered.



[redacted]

G&A rate and Overhead rates contrary to the express terms of the RFP, and (ii) eliminated Gemini from the competition in accordance with the express terms of the amended RFP. See AR 8748; AR 8757, TAB 63 Source Selection Decision Document; AR 8664, AR Tab 57, Memorandum for Record.

Gemini has the burden to prove that the evaluation of its proposal was irrational or contrary to regulation or procedure. But it has offered no evidence to support its bare allegation that "abide by" cannot reasonably be understood as constituting an impermissible capping of its rates, especially given the relationship between its historical rates and those it proposed. Thus, Gemini has not carried its burden and the Agency's reasonable interpretation and resulting actions must stand.

d. In contrast, RRST's proposal affirmatively states that it [redacted]--and its chosen cost categories do not change that.

Gemini alleges that RRST's proposal also capped its rates but was not evaluated in the same manner and removed from the competition. However, the record evidence refutes this allegation. As noted, RRST's final proposal, expressly states that its

[redacted]

AR 5375, AR Tab 44d (emphasis added). In addition, RRST's proposal provides that its projected costs are based on its historicals and projected future experience. In this regard the amounts proposed are much more in line with its actual recent experience than those of Gemini. RRST budgeted for a [redacted] rate in 2024 and [redacted] between 2025 and 2029. See AR Tab 44d 2024-10-30 – RRST (Excel Spreadsheet) Tab "Indirect Rate Support." While RRST's G&A rate was between [redacted] and [redacted] between 2020 and 2022, [redacted]. Id., see



[redacted]

Figure 3, supra. RRST's proposal went on to explain why RRST believes its methodology and projections are sound. See generally, AR 5392-94. For example, RRST acknowledges and addresses the potential impact of differences between projected and actual sales volume:

> [redacted]

> [redacted]

AR 5393-94 (emphasis added).

Between this explanation and its affirmative statement that its proposal includes [redacted], RRST amply addressed the potential for variances in rates in the out years without promising to stick with a specific G&A rate no matter what G&A rates it experiences. Plaintiff's only challenge against RRST's evaluation by the Agency relies entirely on the assertion that RRST must have capped its [redacted].

This facile attack relies on the false premise that proposals must include [redacted] costs. In actuality, while the RFP requires offerors to detail their pool and base costs for all proposed indirect expense rates, it does not require offerors to include all specific types of indirect costs in their proposals, just those that are applicable:

> Indirect rates allocate indirect costs such as overhead, general & administrative (G&A) expense, and fringe benefit costs. The Offeror shall provide the pool and base costs or FPRAs for all proposed indirect expense rates ….



[redacted]

AR 729, Section L.5.4.2.13(a) (emphasis added). Here, RRST did exactly what the RFP required. Its proposal included detailed data concerning the [redacted] types of indirect costs it uses: [redacted].[12] See AR Tab 44d 2024-10-30 – RRST (Excel Spreadsheet) Tab "Indirect Rate Support." RRST's proposal makes clear that it does not designate any of its indirect costs as [redacted] on this or any proposals (or contract). Instead, RRST generally organizes its costs into four categories: [redacted]. Id. There is no [redacted] category in either the historical costs or those projected for the future.

This does not mean that RRST is failing to account for what other contractors (like Gemini) might characterize as [redacted] costs. Even a cursory comparison of RRST's proposed ODC categories to Gemini's proposed [redacted] cost categories reveals that both are incurring these costs though capturing them in different cost pools. See Figure 4, supra.[13] Put simply, Red River

[12] Because RRST is the incumbent on the predecessor contract, the Agency is certainly aware of RRST's accounting practices and its DCAA-approved indirect rates and rate categories, which include [redacted]. In any event, the RRST proposal expressly states it is based on [redacted]. AR 5375, AR Tab 44d (stating that RRST's price submission "contains all [redacted]" and "contains [redacted]"). Unlike Gemini, however, RRST does not label any of its costs as [redacted] See Figure 4, supra.

[13] A review of the proposals for RRST and Gemini shows that RRST primarily performed government contracts and anticipated the work would be done on site, while Gemini engaged in both commercial and government contracts, did not assume all work would be done on site, and had a different corporate set up. Compare Volume IV cost proposals for Gemini and RRST, AR Tabs 43 and 44, respectively. See, e.g., Sikorsky Aircraft Corp. v. United States, 773 F.3d 1315, 1318 (Fed. Cir. 2014) ("Direct costs can be allocated to a particular cost objective (a contract). CAS 418 governs how indirect costs are allocated to government cost objectives. See id. § 9904.418–20. Unlike direct costs, indirect costs are not directly related to one particular cost objective (or contract). See id. § 9904.418–30(a)(2)-(3). Therefore, an allocation base (or allocation method) is used to allocate indirect costs to cost objectives. See id. § 9904.418–40(c). The allocation base allows measurement of the quantity of costs in an indirect pool attributable to a given cost objective. See id. The allocation base used must allocate pooled indirect costs to cost objectives in "reasonable proportion" to the relationship between the indirect costs and the cost objective. Id. For example, direct cost may be used as an allocation base if the amount of



[redacted]

CORE/3533580.0002/199385265.2

included all the costs and indirect rates that it uses. It [redacted] cost pools for which it has provisional rates approved by DCAA – [redacted]. Regardless of whether Agency evaluators used a [redacted] or [redacted]" to denote RRST's lack of proposed [redacted] see, e.g., AR 8669, AR Tab 58, Cost Realism Analysis of RRST, the fact remains that it included [redacted], which is all that the RFP requires. Protester has not produced any evidence to the contrary.

In contrast, Protester proposed that it would abide by its stated G&A and Overhead rates notwithstanding its actual costs and historicals, this did not comply with the terms of the solicitation and the Agency acted reasonably, rationally and in accordance with the express terms of the amended RFP when it determined to exclude Protester.

Accordingly, Plaintiff's claims of unequal evaluation of indirect rates must fail. The Agency reasonably and rationally determined that Plaintiff capped its indirect rates for Overhead and G&A, and that Intervenor did not. The decisions to eliminate Plaintiff from the procurement and allow Intervenor to compete and to award to Intervenor therefore were proper.

2. The Army properly exercised its discretion to waive the Strict Compliance Review upon its reasonable determination that doing so was in the Government's best interests.

Gemini claims that the Army "unfairly ignored noncompliances in every other offerors' proposal" and improperly "allowed all proposals to proceed to Step 1 of the evaluation." Protester's MJAR Memo, at 19 (citing AR 4094, Strict Compliance Waiver). According to Gemini, the RFP only reserved for the Army the right to waive conducting the Strict Compliance Review and not the right to waive the requirement that noncompliant proposals be eliminated from

direct costs consumed by a cost objective is correlated to the indirect costs consumed by that cost objective.") (Footnotes omitted).



[redacted]

consideration for award. Protester's MJAR Memo, at 21. This unreasonable interpretation ignores the plain text of, and requirements inherent in, the relevant RFP provisions, which provide:

> The Government will compare the Offeror's proposal to Section L in order to perform a compliance review. Failure to provide proposals in accordance with the instructions/format specified in this RFP shall render the Offerors proposal non-compliant. The proposal will not be evaluated and will not be further considered for award. The Government reserves the right to waive the Strict Compliance Review if it is in the Government's best interest.

AR 678, Conformed RFP, Section A.18 (emphasis added).[14]

Gemini's argument erroneously focuses solely on the first portion of the reservation of rights provision and ignores the latter. Yes, the RFP states that "[t]he Government reserves the right to waive the Strict Compliance Review." Id. It also makes clear in the same sentence that such a waiver may be made "if it is in the Government's best interests." Id. In other words, when considering the waiver contemplated by the RFP, the Army must weigh compliance with the specific instructions for proposal submission and related default provisions of the RFP against the best interests of the Government to maximize competition.

The Army's determination of whether such a waiver is in the Government's best interest necessarily requires it to first conduct a review of the proposals and analysis of the results. Until such a review and analysis are complete, the Army could not possibly know whether excluding the noncompliant proposals from the procurement would be in the Government's best interests or not and, therefore, it would not have a reasonable basis for waiving the Strict Compliance Review itself.

[14] Accord AR 737, Conformed RFP, Section M.3 ("The Government reserves the right to waive the Strict Compliance Review if it is in the Governments best interest."); id., at Section M.3.2.1 ("The Government will compare the Offeror's proposal to Section L to perform a compliance review. Any Offeror's proposal determined non-compliant per the terms noted in Section L or determined non-compliant per paragraph M.3.2.1.1 below, will not be evaluated and will not be further considered for award.")



[redacted]

Only after it had the results of the review could the Army decide, as it did here, that requiring strict compliance with the RFP proposal instructions would unduly limit the number of offerors under consideration for award and thereby deprive the Government of the benefits of a robust competition. The Army acted rationally and consistent with the stated terms of the solicitation when it determined that waiver of strict compliance was in the Government's best interests because it properly maximized competition and helped the Army obtain best value:

> Due to only two proposals being found compliant, Per Section M.2, the PCO made the determination to waive strict compliance to maximize competition. Excluding these 8(a) Small Business offerors from further evaluations due to non-compliance would significantly reduce competition and is not in the USG's best interest. Moreover, having only two offerors proceed to technical evaluations is not advantageous to the USG. If one or even both offerors are deemed technically unacceptable, then the USG would expend valuable time and resources evaluating the additional offerors.

AR 8754, Source Selection Decision Document (emphasis added); see also, AR 4094, Strict Compliance Waiver, ¶ 2 (nearly identical language) and ¶ 3 ("Per Section M.2 of the FKKY RFP W52P1J-23-R-0088, the Government is waiving the Strict Compliance requirement of the evaluation criteria to allow greater competition and ultimately maximize the Government's ability to obtain the best value.") (emphasis added).

Protester also asserts that, even if the Army reserved the right to consider proposals that were found not strictly compliant, its decision to do so in this instance was arbitrary and capricious. Protester claims that the Army overlooked the fact that there was initially plenty of competition but all the offerors other than Gemini "just ignored various Solicitation requirements while doing so." Protester MJAR Memo, at 21. Protester essentially argues that so long as there was adequate competition at the outset of the procurement it is not reasonable to consider whether and to what extent decisions made during the procurement might unduly limit competition at the time the



[redacted]

award decision is made. The Protester's interpretation is not reasonable as it is at odds with both the standard practice in federal procurements and the terms of the RFP in this matter.[15]

Federal agency solicitations often impose requirements in the proposal instructions to help ensure the competition is conducted fairly. See GovWave, LLC v. United States, 175 Fed. Cl. 564, 636 (2025) (citing 48 C.F.R. § 1.602–2(b) and stating that, when evaluating offerors for Strict Compliance, agencies are required "to treat offerors fairly and impartially."). The RFP explains that the purpose of the Strict Compliance Review in this case was simply to determine whether the offerors' proposals satisfied "all compliance requirements set forth in Section L." AR 737, Conformed RFP, Section M.3.2. It is, however, well established that "[a] proposal's failure to conform to a term or condition of a solicitation renders the proposal unawardable only if the violation relates to a term or condition that is material." Oak Grove Techs., LLC v. United States, 116 F.4th 1364, 1379 (Fed. Cir. 2024) (emphasis added) (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996) (emphasis added)). As such, the government is not required to reject a proposal "'when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired.'" Id. (citing 48 C.F.R. § 14.405) (emphasis added). Here, the Agency specifically found that the deficiencies it identified in the Strict Compliance Review "do not affect the Government's ability to conduct technical evaluations…." AR 4094, Strict Compliance Waiver ¶ 4. In the context of this lack of material impact on the procurement, the Agency's decision is entirely reasonable.

[15] If in fact Plaintiff did not want the Agency to have the right to waive Strict Compliance, it needed to protest that provision prior to the time for submission of proposals. See Section IV.B.1(b), supra. Because it did not, Gemini cannot now complain that the Agency did precisely what it reserved the right to do.



[redacted]

Since it could fairly evaluate the offerors' technical proposals without eliminating them from consideration for award, the Army was able to maximize the competition and did not need to settle for a sole-source award[16] to Gemini (assuming it had met the substantive pricing requirements, which it did not in this case). Of course, this is precisely the sort of situation for which the Army reserved the right to waive the elimination of noncompliant proposals in the first place.

C. Plaintiff has not established that it was prejudiced by the Agency actions here.

To establish prejudice, Plaintiff must show that there was a substantial chance it would have received the award but for the errors in the procurement process. See Section IV.B., supra. While Plaintiff was the lowest priced and may have met the technical and performance requirements of the solicitation, it failed to comply with the terms of the solicitation prohibiting consideration for award of a proposal that capped or discounted indirect rates. Plaintiff was properly determined to have impermissibly capped its indirect G&A and Overhead rates in its proposal. It therefore was properly excluded from the competition by the Source Selection Official and has not established that it was prejudiced by the Agency actions here.

D. Plaintiff has not established grounds for declaratory or injunctive relief.

To prevail, Plaintiff must establish that the Agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. PGBA, LLC v. U.S., 389 F.3d

[16] In its Memorandum in Support of its MJAR, Gemini argues that it was the only offeror "not to receive any noncompliances as part of the agency's strict compliance review." Plaintiff's Memorandum in Support of its MJAR, at 6 (citing AR Tab 36). The Source Selection Evaluation Board Chairperson Report suggests otherwise. AR 8743 (stating "[t]wo (2) offerors were determined to be compliant IAW the RFP" and identifying the two as Gemini and JP Logistics & Consulting). In any event, Gemini has failed to articulate what is unreasonable, arbitrary or capricious about the Agency's decision to maximize competition and its opportunity to obtain best value when the noncompliances at issue had no material impact on the procurement.



[redacted]

1219, 1227-28 (Fed. Cir. 2004). Under PGBA, LLC, to obtain injunctive relief Plaintiff must establish 1) success on the merits of its claims, 2) it will suffer irreparable harm if injunctive relief is withheld, 3) the balance of hardships of the parties favors the grant of injunctive relief, and 4) it is in the public interest to grant injunctive relief. Id. at 1228; Protester's MJAR at 23.

Plaintiff has failed to meet its burden of proof to establish that the Agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and it has not established grounds for either declaratory or injunctive relief.

First, as shown in this Memorandum, contrary to Plaintiff's claim, the Agency acted reasonably and in accordance with the express terms of the solicitation. The solicitation expressly prohibited a proposal to cap or discount indirect rates. Plaintiff submitted a proposal that in clear language capped its indirect cost rates at [redacted] for Overhead and [redacted] for G&A notwithstanding its ultimate costs under the contract. The Source Selection Official reviewed the proposal language and the evaluations of the cost evaluation team, determined that the proposal language was a prohibited cap, and then reasonably excluded Plaintiff from the competition in accordance with the express terms of the amended RFP.

Additionally, the Agency properly determined that Intervenor's proposal did not cap its rates by simply not proposing a separate "overhead" rate. The Agency evaluated the Intervenor's proposal, which included its assumptions and description of the various costs included in Intervenor's direct and indirect cost pools, its historical rate experience and budgeted costs for the contract, and found the proposed pricing was reasonable and realistic. The RFP does not require the inclusion of specific types of costs and there is no note in the evaluations that the Agency found Intervenor improperly excluded any cost categories. Having evaluated the Intervenor's proposal



[redacted]

as reasonable and realistic, the Agency committed no error by including Intervenor in the competition and its award was proper.

Second, Plaintiff has not suffered irreparable harm. Plaintiff failed to establish that it did not cap its indirect rates. As shown above the Agency properly evaluated the Plaintiff's and Intervenor's proposals and determined that Plaintiff did cap its indirect rates contrary to the terms of the amended solicitation. Further, as shown in the Administrative Record and this pleading, Intervenor properly proposed reasonable and realistic indirect rates. Plaintiff was not entitled to participate in the competition following the finding by the Agency that Plaintiff had capped its indirect rates contrary to the terms of the solicitation, and Intervenor was entitled to be considered for and awarded the contract. Therefore, there are no grounds to establish Plaintiff will be irreparably harmed here.

Third, the balance of hardships does not favor an injunction here. Indeed, an injunction to stop the Agency from proceeding with award of the contract to Intervenor here will harm the Agency and Intervenor. Plaintiff has not established that it is entitled to declaratory relief on the merits and the record shows that the Agency properly evaluated and determined to exclude Plaintiff and award to Intervenor.

Fourth, the overriding public interest supports denying the injunction and allowing the award to Intervenor to stand. The Agency acted reasonably and in accordance with the terms of the solicitation, and therefore, under the federal procurement process required by law and regulation, it is in the public's interest to permit the Agency to proceed with performance of the contract awarded to Intervenor through a proper procurement.

## V. CONCLUSION



[redacted]

For the foregoing reasons RRST respectfully requests that the Court deny Gemini's Motion for Judgment on the Administrative Record and request for permanent injunction, and that it grant RRST's Cross Motion for Judgment on the Administrative Record and declare that the Agency decision to award to RRST was proper and authorize the Agency to proceed with full performance of the contract to RRST.

Dated: May 21, 2025.

Respectfully submitted,

s/ Eric Whytsell
Eric Whytsell
STINSON LLP
1144 15th St., Suite 2400
Denver, CO 80202
Email: eric.whytsell@stinson.com
Telephone: 303.500.7193

Counsel of record for
Red River Science and Technology, LLC

Of Counsel:
Susan Warshaw Ebner
Alexandra Stanley
Simone Stover
STINSON LLP



[redacted]

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 21, 2025, all counsel of record who are deemed to have consented to electronic service are being served with a copy of the Defendant-Intervenor's Opposition to Plaintiff's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment to Affirm the Agency's Action Based on the Administrative Record, and Defendant-Intervenor's Memorandum in Support of that Opposition and Cross-Motion via the Court's CM/ECF system.

s/ Eric Whytsell
Eric Whytsell



[redacted]